COMBINED AMERICAN INSURANCE COMPANY, Appellant,

v.

Pauline McCALL, Appellee.

No. 8376.

Court of Civil Appeals of Texas, Amarillo.

June 25, 1973.

Rehearing Denied July 16, 1973.

Brundidge, Fountain, Elliott & Churchill, Mike D. Gibbs, Dallas, for appellant.

Kirby, Ratliff & Sansom, Littlefield, Gibbins & Spivey, Broadus A. Spivey, Austin, for appellee.

REYNOLDS, Justice.

From a judgment rendered following a jury trial awarding the beneficiary recovery of the benefits provided for accidental death by two accident insurance policies, the appellant-insurer has appealed. The one point of error is that the trial court erroneously overruled appellant's motion for instructed verdict because the undisputed evidence established that uninsured disease contributed to the decedent's death which did not result solely from insured accidental bodily injuries. The point is sustained. Reversed and rendered.

Appellant Combined American Insurance Company issued its two policies employing slightly differing insuring language, but insuring Rufus P. McCall

> " . . . against loss resulting directly and independently of all other causes from accidental bodily injuries received . . . while this policy is in force and which loss or injuries are in no way caused or contributed to by disease . . . . "

and specifying that death benefits of $1,500.00 under one policy and $2,000.00

under the other are payable conditional that the insured, while driving or riding in any automobile or truck, suffer such accidental bodily injuries that, under the one policy, are " . . . the sole cause of loss of life by the Insured, . . ." and that, under the other policy, " . . . result directly and independently of all other causes in . . ." loss of life. Appellee Pauline McCall, the insured's wife, was named the beneficiary in each policy.

In mid-afternoon of February 9, 1972, Rufus P. McCall left his home driving a pickup truck. On the next morning of February 10, between the hours of six and seven o'clock, the body of McCall was found floating near his pickup in a shallow playa lake located six-tenths of a mile east of Littlefield, Texas, adjacent to Farm Road 94. The pickup was submerged in the lake up to the top of the hood and the left front door was open. The ignition key was in the "on" position, but the engine was not running. There was a wind out of the north or northeast, the weather was extremely cold, and the chill factor was between eighteen and twenty degrees below zero. It was established that the pickup had veered off the asphalt surface of the road at a forty-five degree angle, gone over a metal reflector post causing a slight dent in the vehicle's front chrome strip, travelled more than ninety feet in a straight line down an embankment into the lake, and stopped some twenty-five feet into the lake.

Justice of the Peace Stanley Doss ordered an autopsy, which was performed by Dr. H. P. Clifton, Jr., a medical doctor specializing in pathology. In performing the autopsy after the body had been embalmed, Dr. Clifton found no external evidence of trauma;[1] the only abnormal external finding recorded was hemorrhage in the area of the embalming incision attributable to the embalming process itself.

He recorded " . . . the heart to be slightly enlarged . . ." and in " . . . the coronary vessels . . . a moderate to severe degree of atherosclerosis with an area of recent occlusion of the anterior descending branch of the left coronary artery." As a result of his autopsy, Dr. Clifton's pathological diagnosis was "CORNONARY ATHEROSCLEROSIS WITH RECENT THROMBOTIC OCCLUSION AND OLD MYOCARDIAL INFARCTION"; the cause of death was stated to be "CORONARY ATHEROSCLEROSIS WITH THROMBOTIC OCCLUSION." Dr. Clifton reported to Justice Doss by telephone that he had found no evidence of trauma or drowning and that McCall " . . . died of a heart attack."

Justice Doss conducted an inquest consisting of his several visual views of the scene of the accident and his talking with and securing information from the deputy sheriff who discovered the accident, the wrecker operator who removed the pickup from the lake, the attending mortician, and the investigating highway patrolman. The purpose of the inquest was to determine if anyone had criminal responsibility for McCall's death. Following this inquest and having before him a copy of Dr. Clifton's autopsy report, Justice Doss filed an inquest report and made the finding therein that McCall " . . . died as a result of a thombotic (sic) coronary occlusion brought about and caused by a motor vehicle accident." The next day Justice Doss completed the certificate of death to show the immediate cause of death as "Cardiac arrest" due to "Automobile accident," and described how the injury occurred by inserting the words "heart attack caused by an automobile accident."

Mrs. McCall's claims to the death proceeds of the two policies were denied on the ground that death was attributable to a disease process and not solely to an acci-

---

1. The justice of the peace, the mortician attending the deceased, and Mrs. Pauline McCall noticed a small bump on the deceased's forehead; however, there is no testimony that the bump itself was a significant factor in the cause of death.

dent independent of all other causes. This suit resulted.

It was and is Mrs. McCall's contention that her husband's death resulted from accidental bodily injuries and that disease neither caused nor contributed to his death. She testified that her husband had been in good health the last year or so before his death, he was not taking medication, there had been no complaints about his physical, mental or emotional state, and he had been working without any limitations on his activities. The theory advanced is that the accident occurred because McCall fell asleep while driving his pickup and it ran into the lake. Awakened, McCall opened the door, at which point he had to be alive and healthy to exert the pressure required to open the submerged door, and stepped into the water to walk back to dry land. This reconstruction of events, so the investigating highway patrolman testified, is consistent with his investigation of the accident. Proceeding, the theory is that the extreme cold and the extremely cold water were such a violent shock to McCall's system that he suffered bodily injury and died from a heart attack, the sole cause of death, after ventricular fibrillation, the immediate cause of death, developed. This reconstitution is maintained supportable by Dr. Clifton's testimony and the certificate of death admitted in evidence. The basic reliant testimony of Dr. Clifton is his statements that ventricular fibrillation was the immediate cause of McCall's death,[2] the heart attack was the sole cause of death, and his response of "Right" when asked if it was true that a person can derive ventricular fibrillation from sudden shock of ice cold water, irrespective of whether a person is an exact medical replica of Rufus P. McCall or not as he existed at the time of the autopsy. The certificate of death is asserted to be, by virtue of Rules 40a and 54a under Article 4477,[3] prima facie evidence of the deceased's accidental death. The conclusion drawn is that the theory is sufficiently supported by the evidence to require jury determination of, and to sustain its findings with respect to, fact issues and, responsive consequentially to appellant's point of error, to preclude an instructed verdict.

To support its defense that pre-existing disease was a contributing cause, and an accidental bodily injury was not the sole cause, of McCall's death, appellant presented the deceased's recorded medical history and the testimony of two, and the only, medical witnesses. In a 1948 examination and treatment by Dr. Gordon, McCall had bronchopneumonia and an acute paroxysmal atrial tachycardia, ". . . which-means (sic) that he had a rapid heart action, paroxysmally at a rate of 200 per minute."[4] In 1955, there were medical findings by Dr. Hull of lung infection and heart racing, which was not recorded as tachycardia. McCall was treated in January, 1969, by Dr. Robert J. Faust for a heart attack, the diagnosis being "1. Arteriosclerotic heart disease 2. Acute myocardial infarction due to coronary atherosclerosis, subepicardial." In February, 1969, McCall consulted an associate of Dr.

---

2. Dr. Arrington (whose identity and testimony are subsequently recited), agreed with Dr. Clifton that ventricular fibrillation was probably the immediate cause of death. Dr. Arrington described ventricular fibrillation as ". . . the term given to the quivering of the ventricle, the heart muscle itself. In essence, it means that instead of contracting rhythmically and pumping, it just quivers, and with ventricular fibrillation and quivering, there is no effective heart pumping force at all, and flow of blood immediately ceases, and a person loses immediate consciousness." Further, he stated ". . . that the occlusion itself does not necessarily cause death" if fibrillation is not developed.

3. All statutory article references are to the number under which the article appears in Vernon's Ann.Tex.Civ.St.

4. Ventricular tachycardia was stated to mean medically a ". . . (rapid) beating of the heart at a rate of 140 to 200 . . ." that ". . . can be 'efficient' enough to allow some pumping of blood to occur, but quite frequently goes right into ventricular fibrillation and sudden death." See note 2, supra.

Gordon and Dr. Hull, Dr. Joe A. Arrington, a medical doctor specializing in, and certified as a specialist in the practice of, cardiovascular diseases. Dr. Arrington's examination revealed a " . . . marked dimunition (sic) in blood flow to the left ventricle, or through the left coronary artery . . . (n)ot necessarily a heart attack, but certainly compatable with it in that area." His diagnosis was " . . . arteriosclerotic heart disease with coronary artery insufficiency and questionable heart infarct, heart attack." Medications were prescribed and McCall was re-examined in March and May, 1969, at which times electrocardiograms revealed a more normal situation than that shown by the previous 1948 and 1955 electrocardiograms. Medications were again prescribed and McCall was scheduled for re-examination and an electrocardiogram in six months, but he did not return to Dr. Arrington. On a provisional diagnosis of sinusitis, polycythemia, and A S H D,[5] McCall was hospitalized for some forty-six hours in July, 1970. On discharge the final diagnosis was the same as the provisional one; however, the treating doctor's recorded "Impression" was that the arteriosclerotic heart disease diagnosis was "by history."

By deposition, Dr. Clifton interpreted his autopsy findings. The atherosclerosis he found tends to narrow the interior circumference of the artery internal diameter, causing a person to be predisposed to a heart attack. The thrombotic occlusion was a blood clot in the coronary vessel. It was his opinion that the clot had formed within twelve hours before death. Dr. Clifton stated that based upon reasonable medical probability the coronary atherosclerosis and the recent blood clot caused

McCall to have a heart attack, and that within reasonable medical probability the atherosclerosis was a contributing factor to the death of McCall. It was his further opinion that the immediate cause of death was ventricular fibrillation. Dr. Clifton said that a person, irrespective of whether he had a good or bad heart or a medical record like that of McCall, can die of ventricular fibrillation from an electrical shock and from sudden shock of ice cold water, and that it is possible for a person to die from ventricular fibrillation from sudden emotional stress. Moreover, Dr. Clifton was not particularly surprised to find McCall's condition of atherosclerosis not different from any other man of the same age.

In his testimony, Dr. Arrington explained the meaning of the terms arteriosclerosis and arteriosclerotic heart disease. Arteriosclerosis means a hardening of the arteries and is a blood vessel disease, but if it does not affect a vital area, there is no heart disease; that is, if arteriosclerosis does not keep the heart from functioning normally, then arteriosclerotic heart disease is not present. Arteriosclerotic heart disease, used interchangeably with the term atherosclerotic heart disease, means that the heart is diseased by the hardening of the arteries, or arteriosclerosis; and this disease occurs when there is developed enough hardening of the arteries so that there is not a sufficient blood supply to the heart muscle.[6]

Dr. Arrington, questioned about Dr. Clifton's autopsy findings, stated his opinion that the reported recent clot blocked or occluded the narrowed arteriosclerotic artery causing a lack of blood supply, and McCall had a heart attack. It was his

---

5. According to the treating doctor's recording, this abbreviation was used for "arteriosclerotic heart disease."

6. Both testifying doctors agreed that hardening of the arteries is a part of the aging process of our society. Dr. Arrington reported that heart evaluators call arteriosclerosis and arteriosclerotic heart disease the "Modern American Epidemic" because 55 per cent of the people who die in the United States die of hardening of the arteries, or diseases related directly to this. Experiments in Korea and South Viet Nam revealed that soldiers in their early twenties had arteriosclerosis to the extent that the medical profession had to re-examine its thinking on the matter.

opinion that the blood clot had formed less than an hour before the death occurred. Based upon his examination and treatment of McCall and upon a reasonable medical certainty, it was Dr. Arrington's opinion that McCall was still suffering from his heart disease in his left descending coronary artery, a critical area, at the time of his death. Furthermore, Dr. Arrington stated that the extreme shock of extreme cold or wind cannot harm a heart without pre-existing disease, and gave his opinion that McCall's pre-existing heart disease was a contributing cause of his heart attack, and that McCall's death would not have occurred had he not had the pre-existing disease. Moreover, Dr. Arrington stated that without pre-existing disease, it was not possible for the type of clot causing McCall's occlusion to occur from fear, exertion, emotional shock, or the cold air and cold water testified about. The doctor did not feel that the large exertion required to open a door of a vehicle submerged in water and the shock of cold wind and water, admittedly causing violence to McCall's system, would precipitate an occlusion and induce fibrillation in a normal, healthy person; but that, although he doubted the application of the word "normal" to McCall since McCall was not normal due to his heart attack and chest pain the last time Dr. Arrington saw him, it was doubtfully possible. Additionally, Dr. Arrington stated that he found no evidence of any bodily injury or trauma sufficient to cause McCall's death directly and independent of any other cause.

Following the presentation of the evidence, appellant moved for an instructed verdict or, alternatively, that the case be withdrawn from the jury and judgment rendered for appellant. The ground stated in the written motion was that the undisputed evidence established that McCall's pre-existing disease contributed to his death. The motion was overruled. The case was submitted to the jury over objections made to the court's charge. Upon submission, the jury found, in response and corresponding to the numbered special issues, that (1a) R. P. McCall sustained accidental bodily injuries on February 10, 1972, (1b) while he was driving or riding in an automobile or truck, and (1c) such injuries were a proximate cause of his death. After the jury returned its verdict, appellant's motion for judgment non obstante veredicto was denied, and judgment was rendered decreeing appellant's liability under, and recovery by appellee on, both insurance policies. On this appeal, no complaint is made to the court's overruling the objections levelled at the charge or to the denial of the judgment non obstante veredicto motion; the single point of error is that the trial court erred in overruling the motion for instructed verdict.

In view of the express contractual liability terms of the insurance policies, it is not sufficient to show that accidental bodily injuries were a proximate cause of death; it is necessary to show that such injuries caused the death "independently of all other causes," that is, such injuries were the sole cause of death, which was "in no way caused or contributed to by disease." Mutual Benefit Health & Accident Ass'n v. Hudman, 398 S.W.2d 110 (Tex.1965). Hence, to escape appellant's right to an instructed verdict, it was obligatory on appellee to produce some evidence of probative force that the deceased's accidental bodily injuries were the sole cause of his death. See Standard Life & Accident Insurance Co. v. Roberts, 318 S.W.2d 757 (Tex.Civ.App.—Amarillo 1958, writ dism'd). Both parties accept the heart attack as the cause of death; the dispute arises over the state of the evidence bearing on the cause of the heart attack. Appellee contends the evidence raised the fact issue and supports the finding that violent shock resulting from the accidental events precipitated the fatal heart attack; appellant contends the medical evidence indisputably established pre-existing disease as a contributing cause of the heart attack and death.

In considering the evidence, the general rule is that the trier of the facts may accept in part and reject in part the opinions of any witness, but the rule is subject to qualification. Initially, the testimony of the witness will be looked to and examined as a whole to give it true effect, Dotson v. Royal Indemnity Company, 427 S.W.2d 150 (Tex.Civ.App.—Fort Worth 1968, writ ref'd n. r. e.), and to determine its legal sufficiency in support of the essential issues. Jones v. Traders & General Ins. Co., 140 Tex. 599, 169 S.W.2d 160 (1943). Additionally, where the subject is one for experts alone and the court or jury has no experience in, or no knowledge of, the specialized subject, the unanimous and uncontroverted opinions of the experts are conclusive. See Coxson v. Atlanta Life Ins. Co., 142 Tex. 544, 179 S.W.2d 943 (1944).

It is judicially recognized that certain specialized medical matters are peculiarly within the factual knowledge of experts and are without the scope of a layman's knowledge, Parker v. Employers Mutual Liability Ins. Co. of Wis., 440 S.W.2d 43 (Tex.1969); Insurance Company of North America v. Myers, 411 S.W.2d 710 (Tex.1966); Bowles v. Bourdon, 148 Tex. 1, 219 S.W.2d 779 (1949), and within the area of medical science, only the opinions of medical experts can have any value in forming conclusions as to the cause and effect of a heart attack. Dotson v. Royal Indemnity Company, supra, Standard Life & Accident Insurance Co. v. Roberts, supra. Thus, the cause of McCall's heart attack is a question of science determinable only from the testimony of medical experts, and must be founded on reasonable probability, and may not rest on possibility. Insurance Company of North America v. Myers, supra.

Accepting as true appellee's reconstruction of the events preceding McCall's heart attack, the only expert medical testimony, based on a reasonable medical probability, bearing on the causation aspect of McCall's heart attack is the testimony that his pre-existing disease contributed to his heart attack and to cause his death. Dr. Clifton's opinions that were based upon and within reasonable medical probability were that coronary atherosclerosis and the recent blood clot caused McCall's heart attack, and that the atherosclerosis was a contributing factor to his death. Dr. Arrington stated that it was not possible for the type of blood clot that caused McCall's occlusion to occur from fear, exertion, emotional shock, or the cold air and cold water circumstances, without pre-existing disease. Dr. Arrington's reasonable medical certainty opinions were that McCall was still suffering from arteriosclerotic heart disease at the time of his death, that his pre-existing heart disease was a contributing cause of the heart attack, and that McCall's death would not have occurred had he not had the pre-existing disease.

Appellee nevertheless argues that, tested by the rule applicable to instructed verdicts, the evidence was sufficient to create a fact issue determination, precluding an instructed verdict. The medical testimony relied upon—viz., arteriosclerosis is a part of the aging process common to all, and McCall's condition was not different from that of any other man of the same age; Dr. Clifton's acknowledgment that a person, irrespective of his heart condition or medical record, "can" die of ventricular fibrillation from sudden shock of ice cold water, and it is "possible" for a person to die from ventricular fibrillation from sudden emotional stress; and Dr. Arrington's admission that it was doubtfully "possible" for physical exertion and the violent shock of cold wind and water to precipitate an occlusion and induce fibrillation in a normal, healthy person—consists of no more than medical possibilities when the medical testimony is examined as a whole to determine its true meaning and legal sufficiency. Medical possibilities can be no more than speculation and conjecture when considered in connection with the scientific question of causation. Insurance Company of North America v. Myers, supra; Parker v. Employers Mutual Liability Ins. Co. of Wis., supra.

Appellee further relies on the certificate of death, under Rules 40a and 54a of Article 4477, as being admissible prima facie evidence of accidental death, and on the report of inquest, introduced by appellant, as raising a fact issue. Buchanan v. American National Insurance Company, 446 S.W.2d 384 (Tex.Civ.App.—El Paso 1969, writ ref'd n. r. e.), is cited as authority supporting the admissibility of the death certificate as prima facie evidence of accidental death. There, the opinion states that the hospitalized decedent was attended by three physicians on the day of his death and, since the court found that the requirements of Article 4477 had been met, the presumption is that the medical certification was made by one of the physicians. That is not the existent situation in our case, for here the certificate of death, and the report of the inquest, were completed by a justice of the peace who admittedly had no medical training or experience, and who admittedly had no medical basis for his opinion. The certificate of death was received in evidence over four specific objections lodged against it as incompetent evidence of accidental death. Rule 40a is the provision of Article 4477 concerned with the medical certification being made, not by a layman, but by the physician, if any, last attending the deceased. It has been held that a certificate of death not prepared by the physician is not admissible under this provisional rule, Tichenor v. Little, 279 S.W.2d 379 (Tex.Civ.App.—Galveston 1955, writ ref'd n. r. e. ); and that, if prepared by one unskilled in the matters to which it relates and admitted in evidence even under the proper certification required by Rule 54a for it to be prima facie evidence of the facts stated therein, the certificate of death is incompetent as evidence upon causation and may not be resorted to in determining liability. Service Mut. Ins. Co. of Texas v. Banke, 155 S.W.2d 668 (Tex.Civ.App.—San Antonio 1941, writ ref'd); Union Central Life Ins. Co. v. Boulware, 238 S.W.2d 722 (Tex. Civ.App.—Beaumont 1951, no writ).

■ The purpose of an inquest is to detect crime and criminal responsibility, if any. Boehme v. Sovereign Camp Woodmen of the World, 98 Tex. 376, 84 S.W. 422 (1905). That was the reason Justice Doss gave for holding the inquest in this matter. Since no provision is made for traversing the finding of the justice of the peace holding the inquest, especially so under the manner in which the inquest was conducted here, the finding of the justice of the peace as to the cause of death is not evidence for use between parties in a civil case, although the report of inquest may be admissible. Boehme v. Sovereign Camp Woodmen of the World, supra.

■ Moreover, since the instruments relied on as prima facie evidence of accidental death and to create a fact issue are the product of a medically untrained and inexperienced person, who admittedly had no medical basis for his opinion, injected in a medical area where only expert medical testimony can serve to prove the reasonable medical probability of causal connection, the certificate of death and the inquest report may not convey an opinion the author is not qualified to personally give and must yield to the expert testimony. Furthermore, the combination of the factual circumstances of an injury and lay testimony, together with expert medical testimony clearly limited to possibilities, is insufficient to support an inferential fact where the question is one of science determinable only from the testimony of medical experts. Insurance Company of North America v. Myers, supra.

■■ Finally, pointing out that arteriosclerosis is a physical condition common to all, and characterizing it as a strictly technical disease, appellee suggests that to permit the condition to defeat recovery is to license insurance companies to take premiums without any risk of loss. That, of course, is neither the substance nor the intent of the decision we reach, for it is settled in Texas law that not every pre-existing bodily condition will defeat recovery under the liability terms of the policies is-

sued to the deceased. See Mutual Benefit Health & Accident Ass'n v. Hudman, supra, where it is made clear that in the usual scientific case, the expert testimony delineates the inoperative conditions from the real causes of the injury or death, or at least raises one or more fact issues for determination by the fact finder. Here, the policies did not cover any loss caused or contributed to by McCall's disease, but covered only loss from accidental bodily injuries resulting independently of all other causes. Since all of the competent medical evidence based on a reasonable medical probability is in agreement that McCall's pre-existing disease was a contributing cause of his death, there is no competent evidence that McCall's accidental bodily injuries were the sole cause of his death, Mutual Benefit Health & Accident Ass'n v. Hudman, supra, and factual determination by the jury was precluded. Bowles v. Bourdon, supra. It follows that appellant's motion for instructed verdict should have been granted.

The judgment of the trial court is reversed, and judgment is rendered that appellee take nothing.