### JCPENNEY LIFE INSURANCE CO., Appellant,

v.

### Lela M. BAKER, Appellee.

### No. 2–99–267–CV.

Court of Appeals of Texas, Fort Worth.

Nov. 16, 2000.

Reynolds & Pennington, L.L.P., H. Allen Pennington, Fort Worth, for Appellant.

Walton, Brown, Walton, et al., Edwin J. Seilheimer, Granbury, William Latham, Fort Worth, for Appellee.

Before DAY and GARDNER, JJ.; and FARRIS, J., (Retired, Sitting by Assignment).

## OPINION

DAY, Justice.

### I. INTRODUCTION

Lela Baker brought suit as the beneficiary of an insurance policy issued by Appellant JCPenney Life Insurance Company ("JCPenney") to Lela's husband, Howard Baker. After Lela filed a claim

with JCPenney, the insurer paid her $40,000 under Part III of Howard's policy, which covered "all other injuries resulting in a loss." However, JCPenney disputed liability under Part II of the policy, which provided for a $100,000 benefit if Howard was injured by an accident while occupying a private passenger automobile.

Lela filed suit, seeking recovery under Part II of the policy, as well as statutory damages and attorney's fees. The jury found in favor of Lela and the trial court entered judgment for $60,000, plus the statutory penalty, interest, and attorney's fees against JCPenney. On appeal, JCPenney alleges that there was no evidence, or alternatively, insufficient evidence, to support the jury's verdict. JCPenney also alleges the trial court abused its discretion in allowing Lela's expert witness to testify.

We affirm.

## II. BACKGROUND

At the time of Howard's death, he and Lela owned and operated Mama's Donut Shop in Granbury. Tuesday through Sunday, Howard left the shop during the early morning hours to deliver donuts to the local motels and stores. On March 13, 1996, at approximately 5:45 a .m., Howard's truck drove off the road while he was making deliveries and plunged into Lake Granbury. Rodney Pickett was driving toward a small bridge beside Lake Granbury with his co-worker, J.D. Hopper, when Pickett saw a splash of water from the lake that "looked like an explosion." The water shot up beside the bridge, reaching the treetops. Midway across the bridge, Pickett and Hopper looked out across the lake, where they saw Howard's truck in the water approximately 75 to 100 feet from the shore. Pickett drove across the bridge and down to the water's edge, where the men noticed the cab of Howard's vehicle was already under water. Pickett backed his truck away from the

lake and drove back to the road to summon help.

As they reached the road, they saw a police cruiser driven by Officer Rodney Casey approaching. Pickett flashed his truck lights at Casey, but the officer continued driving and crossed the bridge. When Pickett decided to go after Casey, he met the officer coming back across the bridge to see if Pickett needed assistance. Pickett told him about seeing the truck in the water. All three men returned to the water's edge and saw that Howard's truck was now almost totally submerged. About fifteen seconds after the truck went completely under water, Pickett and Hopper saw a man surface near the area where the pickup had gone down. The man stayed afloat for a few moments, but then disappeared from their view. Howard's body was pulled from Lake Granbury later that morning.

## III. STANDARD OF REVIEW

In determining a "no-evidence" issue, we are to consider all of the evidence in the light most favorable to the party in whose favor the judgment has been rendered, and to indulge every reasonable inference from the evidence in that party's favor. *Formosa Plastics Corp. v. Presidio Eng'rs & Contractors, Inc.*, 960 S.W.2d 41, 48 (Tex.1998) (op. on reh'g); *Merrell Dow Pharm., Inc. v. Havner*, 953 S.W.2d 706, 711 (Tex.1997), *cert. denied*, 523 U.S. 1119, 118 S.Ct. 1799, 140 L.Ed.2d 939 (1998); *In re King's Estate*, 150 Tex. 662, 244 S.W.2d 660, 661 (1951). If there is more than a scintilla of such evidence to support the finding, the claim is sufficient as a matter of law. *Formosa Plastics Corp.*, 960 S.W.2d at 48; *Leitch v. Hornsby*, 935 S.W.2d 114, 118 (Tex.1996). A "no-evidence" issue may only be sustained when the record discloses one of the following: (1) a complete absence of evidence of a vital fact; (2) the court is barred by rules of law or evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a

vital fact is no more than a mere scintilla of evidence; or (4) the evidence establishes conclusively the opposite of a vital fact. *Merrell Dow Pharm.*, 953 S.W.2d at 711 (citing Robert W. Calvert, *"No Evidence" and "Insufficient Evidence" Points of Error*, 38 Tex.L.Rev. 361, 362–63 (1960)). There is some evidence when the proof supplies a reasonable basis on which reasonable minds may reach different conclusions about the existence of the vital fact. *Orozco v. Sander*, 824 S.W.2d 555, 556 (Tex.1992).

An assertion that the evidence is "insufficient" to support a fact finding means that the evidence supporting the finding is so weak or the evidence to the contrary is so overwhelming that the answer should be set aside and a new trial ordered. *Garza v. Alviar*, 395 S.W.2d 821, 823 (Tex. 1965). We are required to consider all of the evidence in the case in making this determination. *See Maritime Overseas Corp. v. Ellis*, 971 S.W.2d 402, 406 (Tex.), *cert. denied*, 525 U.S. 1017, 119 S.Ct. 541, 142 L.Ed.2d 450 (1998).

## IV. THE INSURANCE POLICY

■ In this case, the insurance policy in effect required that Howard suffer a bodily injury caused by an accident "directly and independently of all other causes." A coverage clause such as this case places the burden on the insured to prove that the loss in question was caused by an accidental bodily injury directly and independently of all other causes. *See Stroburg v. Ins. Co. of N. Am.*, 464 S.W.2d 827, 829 (Tex.1971); *Connecticut Gen. Life Ins. Co. v. Stice*, 640 S.W.2d 955, 958 (Tex. App.—Dallas 1982, writ ref'd n.r.e.). "Independent" as used in the coverage clause means "solely," "only," and "standing alone." *Stroburg*, 464 S.W.2d at 829. Thus, a coverage clause of this type limits recovery to accidental bodily injuries that are the sole cause of death. *See id.* Even so, however, recovery is not defeated when a preexisting condition or disorder is so remote in the scale of causation that it does not materially contribute to the death or injury. *Id.*

## V. WAS HOWARD'S DEATH CAUSED BY AN ACCIDENT INDEPENDENT OF ALL OTHER CAUSES?

■ In its first issue on appeal, JCPenney argues that there is no evidence or insufficient evidence to establish that Howard's death was caused by an accident independent of natural causes. Specifically, JCPenney contends that in order to prevail, Lela had to prove that no natural causes contributed to Howard's death. Because there was some evidence indicating that Howard may have had a coronary problem (i.e., a natural cause) that caused him to lose consciousness and drive into the lake, JCPenney argues that Lela could not establish that Howard's injury was the result of an accident "directly and independently of all other causes" as required by Howard's policy. JCPenney also argues that Lela failed to prove that drowning was the sole proximate cause of Howard's death.

At trial, JCPenney introduced deposition testimony from Chief Medical Examiner Dr. Nizam Peerwani, who performed the autopsy on Howard's body. During the autopsy, Peerwani determined that Howard suffered from hypertension and had an enlarged heart. Peerwani also found that Howard had a hardening of the coronary arteries with eighty to ninety percent occlusion (blockage). Based on Howard's heart condition and on police reports indicating that there was no evidence at the scene indicating that Howard had tried to brake or take other evasive action, Peerwani believed that it was "probable" that Howard "may" have experienced a "cardiac conduction problem, thereby losing control of his vehicle and driving it into the lake."

According to Peerwani's autopsy report, Howard's body "had all the stigmata of drowning[,] including presence of frothy blood-tinged edema fluid in the tracheo-

bronchial tree, wrinkling of palms and soles and severe visceral congestion." In the autopsy report, Peerwani listed the cause of Howard's death as "severe occlusive coronary atherosclerosis with terminal drowning (lake)." During his deposition, Peerwani explained that what he meant by "terminal event" was that "besides [Howard's] cardiac problem[,] there was another cause that intervened and caused him to die." Peerwani said that this cause was asphyxiation by drowning. Peerwani's report also concludes that the manner of death was an "accident." Peerwani admitted that he could not tell from the autopsy results whether Howard had in fact suffered a cardiac conduction problem or other type of heart problem before entering the lake or while in the lake.

To rebut Peerwani's theory that Howard's heart condition had played a role in his death, Lela called Dr. Kuban, a specialist in internal medicine. Kuban agreed that the cause of Howard's death was drowning, but disputed whether there was evidence to conclude that Howard's heart condition contributed to his death. More specifically, Kuban testified about the effects that the two most serious heart conduction problems have on the victim. Kuban explained that the most serious type of cardiac conduction problem is ventribular fibrillation, which causes the heart to stop beating entirely and produces sudden, immediate death. Ventricular tachycardia, on the other hand, allows the heart to continue beating but causes the individual to become extremely weak to the point that they cannot stand or walk. Kuban said that if Howard had experienced either of these conditions, he would not have been able to get his pickup window open and get out of his truck.[1] Kuban said that there were other heart conduction problems that could cause an individual to lose consciousness, but those were not lethal conditions. Finally, according to Kuban, if

Howard had experienced a heart attack, there would be observable findings evident in the autopsy, such as changes in the heart muscle tissue or clogged arteries.

In support of its contention that Howard's death was not caused by an accident independent of natural causes, JCPenney relies on *Mutual Benefit Health & Accident Ass'n v. Hudman*, 398 S.W.2d 110, 112 (Tex.1965). In *Mutual Benefit Health*, the beneficiary sought to recover benefits under a policy that limited recovery for accidental deaths resulting "independent of other causes." *See id.* at 112. The supreme court held that recovery was barred because all the evidence at trial indicated that the decedent's death resulted from a pre-existing heart disease and overexertion on a hot day, which together caused his heart to fibrillate. *See id.* at 111–12.

Six years after *Mutual Benefit Health*, the supreme court decided *Stroburg*, 464 S.W.2d at 829. In *Stroburg*, the decedent died in a one-car collision in which he received extensive bodily injuries, including several broken bones and major internal injuries. *See id.* at 828. In the decedent's policy, the insurer agreed to insure against loss of life resulting "directly and independently of all other causes from bodily injuries caused by accident." *Id.* After the decedent's son filed as beneficiary of the policy, the insurer denied coverage, alleging that the son had failed to show that his father's death was caused by an accident independent of other causes. *See id.* at 828–29. The jury found in favor of the son, and the insurer appealed.

The Austin Court of Appeals determined that the decedent's bodily injuries would not have occurred but for the insured's preexisting bleeding ulcer that caused him to faint while driving. *See Ins. Co. of N. Am. v. Stroburg*, 456 S.W.2d 402, 406 (Tex.

---

1. There was evidence at trial that the weather was very cold that morning. From this, the jury could have inferred that Howard's pickup windows were most likely closed when his truck went into the lake. When his truck was discovered in the water, the driver's side window was open.

Civ.App.—Austin 1970), *rev'd,* 464 S.W.2d 827 (Tex.1971). As a result, the appellate court concluded that the decedent's ulcer was a concurrent cause of death that precluded coverage. *See id.* at 407.

The Supreme Court of Texas reversed, noting that the intermediate appellate court's decision was based upon the erroneous conclusion that if the decedent's ulcer caused the accident, it must have been a cause of his resulting bodily injuries and death. *See Stroburg,* 464 S.W.2d at 830. The court held that absent a clause excluding liability when disease or sickness contributed to the loss "directly *or indirectly,*" a previous medical condition would preclude recovery only when it was the proximate rather than the indirect or remote cause of the loss. *Id.* at 831–32 (emphasis added). Based on the record, the *Stroburg* court determined that the evidence did not conclusively establish that the decedent's ulcer was a proximate cause of his death and that there was some evidence to support the jury's verdict. *See id.* at 832.

In examining these cases, it is clear that Howard's death is more akin to the situation in *Stroburg* than that in *Mutual Benefit Health.*[2] Based on the record in this case, the jury was clearly entitled to find that the evidence indicating that Howard *may* have had a non-lethal coronary event that *may* have contributed to the accident was, at best, evidence of a remote rather than proximate cause of Howard's death.

There was some evidence from which the jury also could have reasonably concluded that drowning was the sole proximate cause of Howard's death. Peerwani and Kuban agreed that the actual cause of Howard's death was drowning. Both experts also agreed that had Howard experienced a heart attack, there would have been some evidence of that in the autopsy results. Additionally, the jury could have decided that Howard did not suffer either of the two most lethal heart conduction problems based on Kuban's testimony that one of those conditions caused immediate death and the other would have rendered Howard so severely weakened that he would be unable to extract himself from his submerged pickup. The jury could also have reasonably believed Kuban's testimony that none of the other heart conduction problems that could have caused Howard to lose consciousness were lethal and, thus, could not have been a concurrent cause of Howard's death.

After reviewing the record, we hold there was some evidence to support the jury's verdict. *See Nat'l Life & Accident Ins. Co. v. Franklin,* 506 S.W.2d 765, 767 (Tex.Civ.App.—Houston [14th Dist.] 1974, writ ref'd n.r.e.) (holding that epileptic seizure causing insured to fall and lose consciousness in bathtub, where insured drowned, was not a "cause" of insured's death so as to exclude insurance coverage). Additionally, based on the record in this case, we cannot say that the jury's finding is so against the great weight and preponderance of the evidence as to be manifestly unjust. *See id.* at 767. Issue one is overruled.

## VI. DID HOWARD INCUR AN INJURY WHILE OCCUPYING HIS VEHICLE?

In its second issue, JCPenney argues that Lela failed to prove that Howard was "occupying" his vehicle at the time of his injury, as required by the policy. Howard's policy defined "occupying" as "in or in direct contact with" the vehicle. At trial, the evidence indicated that Howard did not suffer any traumatic injury to his

**2.** We note that JCPenney cites several other cases in support of its argument, but they are similarly distinguishable. *See Standard Life & Accident Ins. Co. v. Roberts,* 318 S.W.2d 757, 759 (Tex.App.—Amarillo 1958, writ ref'd n.r.e.); *Combined Am. Ins. Co. v. McCall,* 497 S.W.2d 350, 352 (Tex.Civ.App.—Amarillo 1973, writ. ref'd n.r.e.); *Community Life & Health Ins. Co. v. McCall,* 497 S.W.2d 358, 364 (Tex.Civ.App.—Amarillo 1973, writ ref'd n.r.e.); *Republic Nat'l Life Ins. Co. v. Bullard,* 399 S.W.2d 376, 377 (Tex.Civ.App.—Houston 1966, writ ref'd n.r.e.).

body when his truck entered the water. Additionally, Pickett and Hopper testified that they saw Howard surface after the truck became completely submerged. Pickett also testified that he believed Howard drowned after Pickett saw him go underwater for the last time.[3] From Pickett and Hopper's testimony, JCPenney surmises that there was no evidence, and alternatively, insufficient evidence, that Howard suffered any injury while occupying his vehicle.[4] Lela, on the other hand, argues that the jury could have inferred from the evidence that Howard ingested enough water while still in his pickup to begin drowning. We agree with Lela. First, as noted above, both Peerwani and Kuban agreed that the ultimate cause of Howard's death was drowning. In addition, Kuban testified that drowning is a bodily injury caused when the victim's lungs begin to fill up with fluid. Kuban also said that drowning occurs over a period of time, rather than immediately.

Furthermore, according to the autopsy report, at the time of Howard's death, he was sixty-five years old, was six feet four-and-one-half inches tall, and weighed 225 pounds. On the morning that he died, Howard was wearing a long-sleeve shirt, jeans, shoes, and a jacket. His body was found fully clothed. According to Lela's uncontroverted testimony, Howard always wore his seat belt when driving and, thus, was most likely wearing it when his truck entered Lake Granbury.

Tim Hatch, a member of the Fort Worth Fire Department's search and rescue unit, testified about the obstacles Howard faced to get out of his truck as it was sinking into Lake Granbury. Hatch said that when a vehicle enters a body of water and begins to submerge, the pressure from the water prevents the doors from opening. If the vehicle's windows were closed,[5] Hatch said it would be difficult for a passenger to open the window due to "tremendous pressure" from the water on the outside. He also testified that to open a window, the passenger would have to exert "a lot" of pressure on the handle. Even then, the passenger would be unable to get out until the pressure inside the vehicle was equalized, i.e., until the vehicle was completely full of water. Finally, Hatch opined that any person inside a vehicle that was submerged was in perilous danger and the colder the water, the greater the danger.

Evidence adduced at trial indicated that the water in Lake Granbury was extremely cold on the morning of Howard's death. Local weather reports introduced into evidence indicated that the water temperature was approximately fifty-four degrees. Dan Ames, a volunteer rescue diver who went into the water shortly after Howard disappeared testified that the water was so cold it took his breath away. Ames estimated the water temperature to be approximately thirty-five to forty-two degrees Fahrenheit.

There was also testimony about how long Howard's truck was under water before he appeared. The uncontradicted evidence indicated that the cab of Howard's truck was almost completely submerged within several seconds after hitting the water. Additionally, there was testimony that two to two-and-one-half minutes elapsed from the time the cab of Howard's

---

3. JCPenney also argues that Hopper testified that Howard did not drown inside his truck. At trial, JCPenney's attorney asked Hopper, "All right. It's-if this gentleman drowned, it's clear to you, is it not, that he did not drown inside of his pickup truck?" Hopper responded, "No, sir." Because of the awkward wording of counsel's question, it is unclear whether Hopper was agreeing or disagreeing with counsel's statement.

4. We note that the policy language is clear that the insured did not have to actually die in the vehicle. The policy expressly covers death caused by an accidental injury sustained while occupying an automobile, provided that death occurs within 365 days of the accident.

5. As noted above, the evidence at trial indicated that because of the cold weather, Howard's truck windows were most likely closed when his truck went into the lake.

truck went underwater until Howard was seen by the eyewitnesses.

There was contradictory evidence from two eyewitnesses about the length of time that Howard was seen in the water. Hopper acknowledged telling the police that Howard had treaded water for two to three minutes before he went under, but admitted that his estimation could have been wrong. At trial, Hopper estimated that the time might have been closer to forty-five seconds to one minute and fifteen seconds. The other eyewitness, Pickett, testified that he saw a dark shadow in the water that appeared to be a person. Pickett said that the person might have been treading water, but there was little arm movement. Pickett said that when he turned away to speak to Hopper, the shadow disappeared. As he continued to watch, Pickett saw a head pop back out of the water, but there was no arm movement this time. Pickett said that he saw the head above water for two to three seconds the first time and from one to two seconds the next time.

Finally, Granbury Police Officer Mitch Galvan testified that he arrived at the scene one minute after Officer Casey issued a call for assistance. Galvan said the taillights of Howard's truck were already underwater and that the water was bubbling up. Galvan was talking to Casey when he heard one of the bystanders (apparently Hopper or Pickett) shout "there he is, he's trying to swim." Galvan said that the bystander was pointing toward the bubbling in the water, but Galvan did not see anyone out there. About twenty minutes later, Galvan found Howard's body against the creek bank.

■ As the trier of fact, the jury is the sole judge of the credibility of the witnesses and the weight to be assigned to their testimony. *Leyva v. Pacheco*, 163 Tex. 638, 358 S.W.2d 547, 549 (1962); *Ambassador Dev. Corp. v. Valdez*, 791 S.W.2d 612, 618 (Tex.App.—Fort Worth 1990, no writ). The jury may also draw reasonable inferences from the facts and choose between conflicting inferences. *Ramo, Inc. v. English*, 500 S.W.2d 461, 467 (Tex.1973); *Valdez*, 791 S.W.2d at 618. We cannot overturn the fact finder's ruling unless only one inference can be drawn from the evidence. *See Havner v. E-Z Mart Stores, Inc.*, 825 S.W.2d 456, 461 (Tex. 1992).

On the face of this record, it is clear that the jury could have believed from the evidence that Howard ingested sufficient water to begin drowning while still in his pickup. Although conflicting inferences could be drawn from the evidence, we are not the fact finder, and we cannot substitute our judgment for that of the jury. Because there was some evidence to support the jury's verdict, and because the evidence to the contrary is not so overwhelming to make the jury's finding manifestly unjust, we overrule issue two.

## VII. DR. KUBAN'S TESTIMONY

In its final issue on appeal, JCPenney claims that the trial court abused its discretion in allowing Lela's expert witness to testify because (1) he was not qualified as an expert in pathology and (2) Lela failed to show that his testimony was reliable under *E.I. du Pont de Nemours and Co. v. Robinson*, 923 S.W.2d 549 (Tex.1995).

### A. QUALIFICATIONS

■ In this case, JCPenney contends that the trial court abused its discretion in determining that Kuban was qualified to testify about Howard's cause of death because he was not a pathologist. Additionally, JCPenney complains that Kuban did not read any pathology articles in preparation for his testimony. Finally, JCPenney argues that Kuban was not qualified to testify because he acknowledged that there were pathology journals and articles that analyzed and provided error rates for his theories, "but admitt[ed] he was not familiar with the names or even contents of these works."

A finding that a witness is qualified to testify as an expert is a matter within the trial court's discretion, and such finding will not be disturbed absent a clear abuse of discretion. *Broders v. Heise*, 924 S.W.2d 148, 151 (Tex.1996). "The test for abuse of discretion is whether the trial court acted without reference to any guiding rules or principles." *Id.* (citing *Robinson*, 923 S.W.2d at 558). The party offering the expert's testimony bears the burden of proving that the witness is qualified under Rule 702 of the Texas Rules of Evidence. Tex.R.Evid. 702; *see Broders*, 924 S.W.2d at 151–52.

Rule 702 requires that an expert be qualified "by knowledge, skill, experience, training, or education" and that his testimony will assist the trier of fact. Tex. R.Evid. 702; *United Blood Servs. v. Longoria*, 938 S.W.2d 29, 30–31 (Tex.1997). Whether an expert is qualified is a preliminary question to be decided by the trial court. *Gammill v. Jack Williams Chevrolet, Inc.*, 972 S.W.2d 713, 718 (Tex.1998). The offering party must demonstrate that the witness possesses special knowledge on the precise matter that he is called to testify about. *Id.* at 718–19.

A review of the record indicates that the trial court did not abuse its discretion in determining that Kuban was qualified as an expert in this case. Kuban was called to testify about two primary issues: (1) the physical capabilities of a person experiencing a cardiac conduction problem or a heart attack; and (2) the physical findings that would show up on an autopsy after a cardiac event in which the victim died. Based on the autopsy report, he also testified about the cause of Howard's death.

Kuban has a Doctor of Osteopathy from the University of North Texas Health Sci-ence Center and is board certified with the American College of Osteopathic Internists. He has been in private practice for thirteen years and specializes in internal medicine, including the cardiac and respiratory systems. In his practice, Kuban is routinely called upon to make cause of death determinations. Kuban said that he often uses autopsy reports and pathologist reports to determine a patient's cause of death, and relies on pathologist reports "almost daily" to aid him in forming his own medical opinions.

Kuban testified that certain physical manifestations would be evident on an autopsy to indicate that a person had a heart attack and that he was familiar with those indicia. Kuban was also knowledgeable about what physically happens to a person who drowns and the signs in an autopsy report that shows the victim drowned. Finally, Kuban testified that he had reviewed Peerwani's autopsy report and the statements from witnesses at the scene and felt qualified to give an opinion on whether, based on a reasonable medical probability, coronary artery disease was a cause of Howard's death.

Contrary to JCPenney's contention, Kuban did not testify that there were pathology articles testing *his opinions* that he had not reviewed.[6] Rather, after a confusing series of questions, JCPenney's attorney asked whether there were studies and testing to show incidents of heart conditions that caused a loss of consciousness. Kuban agreed that such studies and testing existed. However, Kuban said *there was no way to directly test for a coronary conduction abnormality after a person died.* Kuban said that for this reason, it was impossible to do a peer review of or determine an error ratio on someone's theory that the patient had experienced a

---

**6.** It was Kuban's opinion that: (1) Howard did not experience a heart attack because there would have been evidence of that in the autopsy findings; (2) no heart conduction problem could have been a concurrent cause of Howard's death because the two most serious problems would have rendered him un-able to escape his vehicle as he did and the other problems were not lethal; and (3) there simply was no evidence *in the autopsy* from which one could conclude that Howard actually experienced a cardiac conduction problem.

coronary conduction problem that caused the patient's death. Kuban never testified that a heart condition such as Howard's could not have caused him to lose consciousness. Instead, he said, under the facts of this case, it could not be determined within a reasonable medical probability that Howard had experienced a coronary conduction problem that caused him to become unconscious and lose control of his truck.

Finally, while Kuban explained that while he did not read pathology texts because he was not a pathologist, he testified he did read medical journals that discussed pathology as it relates to the fields of cardiology and pulmonary medicine. Kuban also said he daily reviewed pathology reports, cardiology texts, and pulmonary texts. Finally, Kuban testified he had reviewed articles on the subject of pathology related to cardiac heart disease, coronary atherosclerosis, and conduction abnormalities in preparation for his testimony. Based on this record, we cannot say the trial court abused its discretion in determining that Kuban was qualified to testify.

### B. Was Kuban's Testimony Reliable?

 ▬▬ Next, we must ascertain whether Kuban's opinions were reliable. Rule 702 vests a trial court with the threshold responsibility of ensuring that an expert's testimony rests on a reliable foundation. *Gammill*, 972 S.W.2d at 728. In meeting that responsibility, a trial court is not to determine whether an expert's conclusions are correct, but only whether the analysis used to reach those conclusions is reliable. *Id.* In *Robinson*, the Texas Supreme Court espoused six factors that it believed would be helpful in determining whether expert testimony is reliable: (1) the extent to which the theory underlying the expert's testimony has been tested; (2) the extent to which the technique relies upon the subjective interpretation of the expert; (3) whether the theory has been subjected to peer review and/or publication; (4) the technique's potential

rate of error; (5) whether the underlying theory or technique has been generally accepted as valid by the relevant scientific community; and (6) the nonjudicial uses which have been made of the theory. *Robinson*, 923 S.W.2d at 556–57.

In this case, JCPenney contends that Kuban's testimony should have been excluded because it could not meet any of the factors set forth in *Robinson* to determine the reliability of his testimony. Recently, the Texas Supreme Court addressed the issue of scientific and nonscientific evidence under *Robinson* and determined that while all expert testimony must be reliable before it may be admitted, the factors affecting reliability as outlined in *Robinson* are not applicable to all expert testimony. *Gammill*, 972 S.W.2d at 727. The *Gammill* court explained the inherent difficulty in assessing the reliability of experience-based testimony by its reference to the "beekeeper analogy" found in *Berry v. City of Detroit:*

> [I]f one wanted to explain to a jury how a bumblebee is able to fly, an aeronautical engineer might be a helpful witness. Since flight principles have some universality, the expert could apply general principles to the case of the bumblebee. Conceivably, even if he had never seen a bumblebee, he still would be qualified to testify, as long as he was familiar with its component parts.
>
> On the other hand, if one wanted to prove that bumblebees always take off into the wind, a beekeeper with no scientific training at all would be an acceptable expert witness if a proper foundation were laid for his conclusions. The foundation would not relate to his formal training, but to his firsthand observations. In other words, the beekeeper does not know any more about flight principles than the jurors, but he has seen a lot more bumblebees than they have.

*Gammill*, 972 S.W.2d at 724–25 (quoting *Berry v. City of Detroit*, 25 F.3d 1342, 1349–50 (6th Cir.1994)) (emphasis omitted).

As is evident from the discussion of Kuban's qualifications above, his opinions are based largely upon his experience and observations in the medical field. Thus, his opinions are clearly not the type of testimony that can be easily evaluated under the *Robinson* factors. In cases such as this, *Gammill* directs us to determine whether there is an "analytical gap" between the expert's opinion and the basis on which it is founded. *Gammill*, 972 S.W.2d at 726. Here, Kuban testified that he treats people with coronary artery disease on a daily basis and regularly treats persons actually in the throes of a heart attack or a coronary conduction problem. Kuban said that based on his observations and experience, he was knowledgeable about how both of these medical conditions physically affect the human body and what a person experiencing either of those conditions would be capable of doing. Kuban then offered his medical opinion on what Howard would have been capable of physically doing if he had experienced a serious heart conduction problem. Finally, Kuban testified that he was experienced in reviewing pathologist reports and making cause-of-death determinations from those reports. Kuban said he reviewed Peerwani's autopsy report and drew conclusions from that report regarding the cause of Howard's death.

This evidence, as well as the evidence set forth above regarding Kuban's qualifications, establishes that his testimony was closely related to his experiences in the medical profession. Accordingly, we conclude that the trial court's decision that Kuban's testimony was reliable was not made without resort to guiding rules and principles and, thus, was not an abuse of discretion. Issue three is overruled.

## VIII. CONCLUSION

Having overruled JCPenney's issues, we affirm the trial court's judgment.