COURT OF APPEALS
SECOND DISTRICT OF TEXAS
FORT WORTH
 
NO. 
2-03-109-CV
 
THOMAS WIGGS AND PATRICIA WIGGS                               APPELLANTS 
 
V.
 
ALL SAINTS HEALTH SYSTEM D/B/A                                       APPELLEES 
ALL SAINTS EPISCOPAL HOSPITAL/FORT
WORTH, GEORGE CRISP, M.D., ALLEN
KENT, M.D., AND ROBERT LAGON, M.D.
 
------------
 
FROM THE 
67TH DISTRICT COURT OF TARRANT COUNTY 
 
------------
 
OPINION
 
------------
I. INTRODUCTION
        This is a medical malpractice case in which appellants Thomas and 
Patricia Wiggs (“the Wiggs”) claim negligent acts of appellees All Saints Health 
System d/b/a All Saints Episcopal Hospital/Fort Worth and Drs. George Crisp, 
Allen Kent, and Robert Lagon caused Mr. Wiggs’s loss of vision following back 
surgery. The Wiggs offered the testimony of their designated experts, Drs. 
Richard Watkins and James Key, on the alleged cause of Mr. Wiggs’s condition, 
which they identified as ischemic optic neuropathy (“ION”). According to Dr. 
Watkins, prolonged hypertension and significant blood loss during Mr. Wiggs’s 
surgery resulted in hypoperfusion and lack of blood and oxygen to his optic 
nerves, causing ION. 
        On the appellees’ motion, the trial court excluded the medical causation 
testimony of the Wiggs’ experts as scientifically unreliable. The trial court then 
entered a final take-nothing judgment in favor of appellees, on the basis that the 
Wiggs had no evidence of causation. In two issues, the Wiggs contend the trial 
court erred by excluding their medical causation testimony and granting 
judgment against them for lack of such testimony. We affirm. 
II. STANDARD OF REVIEW FOR EXPERT TESTIMONY
        An expert may testify on scientific, technical, or other specialized 
subjects if the testimony would assist the fact finder in understanding the 
evidence or determining a fact issue. Tex. R. Evid. 702. A two-part test 
governs whether expert testimony is admissible: (1) the expert must be 
qualified; and (2) the testimony must be relevant and based on a reliable 
foundation. Id.; E.I. du Pont de Nemours & Co. v. Robinson, 923 S.W.2d 549, 
556 (Tex. 1995) (adopting Daubert v. Merrel Dow Pharms., Inc., 509 U.S. 579, 
591-92, 113 S. Ct. 2786, 2976 (1993)). The proponent of the expert 
testimony bears the burden of showing both tests have been met. Tex. R. Evid. 
104(a), 702; Robinson, 923 S.W.2d at 557. The trial court makes the 
threshold determination of whether the expert and the proffered testimony meet 
these requirements. Robinson, 923 S.W.2d at 556-57; Marvelli v. Alston, 100 
S.W.3d 460, 474-75 (Tex. App.—Fort Worth 2003, pet. denied). The trial 
court has broad discretion to determine admissibility, and we will reverse only 
if there is an abuse of that discretion. Robinson, 923 S.W.2d at 558. A 
reviewing court cannot conclude that a trial court abused its discretion if, in the 
same circumstances, it would have ruled differently or if the trial court 
committed a mere error in judgment. Id. Instead, the test is whether the trial 
court acted without reference to any guiding rules or principles; in other words, 
whether the act was arbitrary and unreasonable. Id. 
III. THE RELIABILITY OF THE EXPERTS’ CAUSATION TESTIMONY
        In issue one, the Wiggs contend that the trial court erred by finding that 
they failed to show a reliable scientific basis for the causation testimony offered 
by their experts, by excluding the medical causation testimony of their experts 
as scientifically unreliable, and by granting judgment against them for lack of 
causation testimony. Specifically, the Wiggs claim that the trial court excluded 
the testimony without reference to the applicable guiding rules or principles, 
constituting an abuse of discretion which resulted in the rendition of an 
improper judgment in this case. In issue two, the Wiggs argue that the trial 
court also erred if the medical causation testimony was excluded for any reason 
other than scientific unreliability. 
 


A. Standard of Review
        Expert testimony must be based on a reliable foundation of scientific or 
professional technique or principle. Robinson, 923 S.W.2d at 557. When the 
expert’s underlying scientific technique or principle is unreliable, the expert’s 
opinion is no more than subjective belief or unsupported speculation and is 
inadmissible. Id. In ensuring that the testimony rests on a reliable foundation, 
the trial court is not to determine whether an expert’s conclusions are correct, 
but only whether the analysis used to reach those conclusions is reliable 
considering all the evidence. Gammill v. Jack Williams Chevrolet, Inc., 972 
S.W.2d 713, 728 (Tex. 1998); Marvelli, 100 S.W.3d at 475. 
        In Robinson, the Texas Supreme Court set forth six factors, now known 
as the Daubert/Robinson factors, to aid courts in determining whether scientific 
testimony is reliable: (1) the extent to which the theory has been tested; (2) the 
extent to which the technique relies on the expert's subjective interpretation; 
(3) whether the theory has been subject to peer review and/or publication; (4) 
the technique's potential rate of error; (5) whether the underlying theory or 
technique has been generally accepted as valid by the relevant scientific 
community; and (6) the nonjudicial uses that have been made of the theory or 
technique. Robinson, 923 S.W.2d at 557; Gammill, 972 S.W.2d at 720-21; 
Marvelli, 100 S.W.3d at 475. 
         Following Robinson, the Texas Supreme Court addresses the issue of 
scientific and nonscientific evidence and determined that while all expert 
testimony must be reliable before it may be admitted, the factors affecting 
reliability as outlined in Robinson are not applicable to all expert testimony. 
Gammill, 972 S.W.2d at 726. Instead, where experts rely on experience and 
training rather than a particular methodology to reach their conclusions, Gammill 
directs us to determine whether there may be “simply too great an analytical 
gap between the data and the opinion proffered” for the opinion to be reliable. 
Id.; JCPenney Life Ins. Co. v. Baker, 33 S.W.3d 417, 428 (Tex. App.—Fort 
Worth 2000, no pet.). 
        Still, in discharging its duty as “gatekeeper,” the trial court is in the best 
position to decide whether some or all of the Daubert/Robinson factors and/or 
the Gammill general reliability test should be applied to determine the reliability 
of the expert’s testimony. Gammill, 972 S.W.2d at 726; see Couch v. 
Simmons, 108 S.W.3d 338, 342-43 (Tex. App.—Amarillo 2003, no pet.) 
(applying Daubert/Robinson factors and Gammill analytical gap test); see also 
Mo. Pac. R.R. Co. v. Navarro, 90 S.W.3d 747, 758 (Tex. App.—San Antonio 
2002, no pet.) (applying Daubert/Robinson factors and Gammill analytical gap 
test).
B. ApplicationOn appeal, the Wiggs argue that the trial court incorrectly applied the
Daubert/Robinson factors to this case because their experts’ opinions were
based on the experts’ knowledge, skill, experience, training, and education. 
See Gammill, 972 S.W.2d at 726; JCPenney Life Ins. Co., 33 S.W.3d at 428. 
They conclude, therefore, that the trial court should have applied the
“analytical-gap” test, and that by allegedly excluding the testimony as
scientifically unreliable under the Daubert/Robinson factors, the trial court
abused its discretion by acting without reference to the applicable guiding rules
and principles. In other words, the Wiggs contend that by applying the wrong
standard, the trial court applied no standard. We disagree.
        In their motions to exclude, appellees asserted that the opinions of Drs. 
Watkins and Key lacked a reliable scientific basis because they did not conform 
to the analysis under the Daubert/Robinson factors. While it is true that the 
trial court agreed with appellees in the result, the trial court’s order excluding 
the testimony does not specify what analysis the trial court applied in assessing 
the reliability of the testimony. 
 

 Moreover, a review of the record indicates that 
regardless of the standard the trial court applied in excluding the testimony, it
did not abuse its discretion in determining that the experts’ testimony was
scientifically unreliable in this case.
 

 See Gammill, 972 S.W.2d at 724-25. 
1. Daubert/Robinson Factors 
        Analyzing the evidence in this case in light of the Daubert/Robinson 
factors, we conclude that the evidence shows that the theory relied on by the 
experts has not been sufficiently tested, is controversial within the relevant 
scientific community, requires subjective interpretation, and has not been 
subjected to sufficient peer review. Moreover, the evidence shows that the 
experts failed to sufficiently rule out other causes. On appeal, the Wiggs fail 
to argue that their experts’ causation testimony was reliable under the 
Daubert/Robinson factors and do not attempt to contradict the evidence cited 
by appellees to establish unreliability under the factors. The trial court, 
therefore, did not abuse its discretion in determining that the experts causation 
testimony was scientifically unreliable under the Daubert/Robinson factors. 
2. Gammill’s Analytical Gap Test 
        In applying Gammill’s “analytical gap” test, which the Wiggs contend is 
required, we must analyze the underlying data forming the basis for the expert’s 
opinion. 972 S.W.2d at 726; D.S., 19 S.W.3d at 529. “If the foundational 
data underlying opinion testimony are unreliable, an expert will not be permitted 
to base an opinion on that data because any opinion drawn from that data is 
likewise unreliable.” Merrell Dow Pharm., Inc. v. Havner, 953 S.W.2d 706, 
714 (Tex. 1997), cert. denied, 523 U.S. 1119 (1998). In the present case, the 
trial court properly recognized that the experts’ experience and training and the 
medical literature that served as the basis for their opinions were unreliable, 
which also rendered their opinions unreliable. 
a. Dr. Watkins’s Experience and Training
        Dr. Watkins’s opinion was purportedly based on his qualifications as an 
anesthesiologist, his experience in providing anesthesia care to more than 
7,000 patients during surgery, a review of Mr. Wiggs’s medical records, and 
medical literature. The quantity of Dr. Watkins’s “experiences” in cases of this 
nature is insufficient to render his opinion on causation reliable. Of all his 
cases, less than one percent involved providing anesthesia care to patients 
undergoing spinal surgery. Moreover, Dr. Watkins has never administered 
anesthesia in a case like the present one, where the patient was undergoing 
multiple procedures during one surgery, and where the neurosurgeon did not 
become involved in the surgery until after the surgery had begun. 
        The quality of Dr. Watkins’s experience does not make his opinion on the 
cause of ION any more reliable. Of the 7,000 patients to whom he has 
administered anesthesia, only one “may have had” ION. “Certainly, if [an 
expert] is primarily depending on his experience to support his opinion, he 
would have to have seen it more than once.” State Farm Lloyds v. Mireles, 63 
S.W.3d 491, 499 (Tex. App.—San Antonio 2001, no pet.). Dr. Watkins’s lack 
of personal experience with patients having ION amounts to no experience at 
all. Likewise, Dr. Watkins has no special training regarding ION and its causes. 
He has never treated anyone for ION, nor has he ever made a diagnosis of ION. 
Finally, Dr. Watkins has never authored medical journal articles on ION. 
b. Dr. Key’s Experience and Training
        Dr. Key’s opinion was purportedly based on his qualifications as an 
ophthalmologist, his experience in evaluating and diagnosing ION, his 
examination of Mr. Wiggs, and his knowledge of medical literature dealing with 
ION. Dr. Key’s experience as a general ophthalmologist does not make his 
opinions on causation reliable. Approximately 30% of his clients are contact 
lens patients, 30% are glasses patients, and 20% are cataracts patients. The 
remaining 15-20% are a general mix consisting mostly of acute problems, such 
as red eyes, discharge, pain, and retinal problems. Moreover, since becoming 
an doctor in 1970, Dr. Key has diagnosed only 40 post-surgery ION patients. 
Although this experience might provide a basis for Dr. Key to express an 
opinion on diagnosing and treating ION, it does not provide a reliable basis for 
him to render an expert opinion on what caused a particular patient’s ION. 
Additionally, Dr. Key likewise has no special training regarding ION and its 
causes. Finally, he has conducted no studies or research concerning ION.c. Medical Literature 
        If a medical expert seeks to support his opinion on causation with medical 
literature, he must base his opinion on a “broad reading of the medical 
literature.” Minn. Min. & Mfg. Co. v. Atterbury, 978 S.W.2d 183, 193 (Tex. 
App.—Texarkana 1998, pet. denied). “Broad reading of medical literature” 
means that the expert must “point to specific passages in varied and different 
sources that are generally accepted as support for his conclusion.” Id. Here, 
although the Wiggs assert that Dr. Watkins’s opinions were based on a “broad 
reading of medical literature,” Dr. Watkins admitted that he merely “pulled” only 
two articles. He also neither explained how the two articles — or any other 
articles — supported his opinion nor pointed to specific passages supporting his 
opinion.
        Moreover, none of the medical literature cited by the Wiggs concludes, 
as posited by Drs. Watkins and Key, that “prolonged hypotension and 
significant blood loss” actually causes ION. Instead, the literature they cite 
demonstrates that the causes of ION are simply unknown in the scientific 
community. For example, the journal article entitled “Unilateral Blindness After 
Prone Lumbar Spine Surgery,” authored in 2001, discussed the case of ION 
occurring after an uneventful spine operation in a relatively healthy man. The 
article noted that “[c]learly, other factors, intrinsic either to the patient (e.g. 
ocular vascular anatomy, coexisting illness) or to the operation . . . may have 
important contributory roles in the development of postoperative visual 
deficits.” The article concludes by stating that “despite the apparent increase 
in the incidence of peri-operative visual deficits over the past 5-10 yr, we do 
not know the precise etiologic factors, nor do we know how to prevent it.” 
        Another journal article furnished by the Wiggs, entitled “Postoperative 
Visual Loss, Still No Answers — Yet,” authored in 2001, similarly demonstrates 
that causation of ION remains unclear. It notes that post-operative vision loss 
has “evoked controversy,” and asks the rhetorical question, “Is it a preventable 
injury?” The article further confirms that ION occurring during surgery is rare, 
with incidents of post-operative vision loss in a general surgical population 
being one in 61,000. The article concludes by stating that “[t]his low incidence 
renders a prospective study difficult if not impossible.” 
        In summary, the doctors’ experience and training in their respective fields 
and the medical literature did not form a reliable basis for their opinions as to 
the cause of Mr. Wiggs’s post-operative vision loss. When the bases for the 
experts’ opinion are unreliable, their opinions are also unreliable. Havner, 953 
S.W.2d at 714. Therefore, because an analytical gap exists, the trial court did 
not abuse its discretion by excluding the experts’ testimony as scientifically 
unreliable. Gammill, 972 S.W.2d at 726. 
IV. CONCLUSION Since the Wiggs presented no causation evidence other than that of Drs. 
Watkins and Key, and the trial court ruled their testimony was not reliable, an 
essential element of the Wiggs’s claims is not supported by evidence. Marvelli, 
100 S.W.3d at 475. Accordingly, the take-nothing judgment rendered by the 
trial court against the Wiggs was appropriate. We overrule the Wiggs’s first 
issue. In light of our decision, we need not address the Wiggs’s remaining 
issue on appeal. See Tex. R. App. P. 47.1. 
We affirm the trial court’s 
judgment.
 
                                                          SAM J. DAY
                                                          JUSTICE
 
PANEL B:   DAUPHINOT and HOLMAN, JJ.; and SAM J. DAY, J. (Retired,
Sitting by Assignment).
 
DAUPHINOT, J. dissents without opinion.
 
DELIVERED: December 31, 2003