COURT
OF APPEALS
SECOND
DISTRICT OF TEXAS
FORT WORTH
NO. 2-01-329-CV
 
JESS WILLIAM REED, MAUREEN REED,       
           
           
           
    APPELLANTS
LYNN BAUGH, DONNA REED, AND
JENNIFER REED
V.
GRANBURY HOSPITAL CORPORATION       
           
           
           
         
APPELLEE
D/B/A LAKE GRANBURY MEDICAL CENTER
 
------------
FROM THE 355
TH DISTRICT COURT OF HOOD
COUNTY
------------
OPINION
------------
I. Introduction
Jess William Reed, Maureen Reed,
Lynn Baugh, Donna Reed, and Jennifer Reed (collectively, the Reeds) appeal from
a summary judgment for Granbury Hospital Corporation d/b/a Lake Granbury Medical
Center (the Hospital) on the Reeds' medical negligence claims. In three issues,
the Reeds contend the summary judgment is improper because the trial court
erroneously struck their experts' testimony on the standard of care; the record
contains more than a scintilla of evidence on the standard of care; and the
trial court improperly struck certain testimony elicited from a Hospital nurse.
Because we conclude that the trial court did not abuse its discretion by
striking the experts' testimony on the standard of care, we will affirm the
trial court's judgment.
II. Background
Facts
In March 1998, Jess Reed suffered
stroke-like symptoms and was taken to the Hospital. Maureen Reed, a registered
nurse, had recently heard on a television documentary program that the drug t-PA(1)
could be used as a "clot-busting" treatment for stroke if administered
within three hours after a stroke. Therefore, she chose to have her husband
taken to the Hospital, which was only about ten minutes from the Reeds' Granbury
home, rather than to a more distant Fort Worth hospital that the Reeds' health
care plan used.
At the Hospital, Mrs. Reed told Dr.
Don Davis, the emergency-room physician, that she had heard about t-PA and,
"if possible, [she] wanted Jess to get this." Dr. Davis said nothing,
turned around, and walked back into the emergency room. After Mr. Reed was
admitted to the Hospital, he was diagnosed as having had a stroke and given a CT
scan. The evidence regarding whether Mr. Reed was eligible to receive t-PA is
conflicting. Although the radiologist who reviewed the CT scan initially
concluded that it was negative for a brain hemorrhage, one of the Hospital's
experts testified by affidavit that the CT scan revealed early signs of brain
damage, which would have disqualified Mr. Reed as a t-PA candidate.
After waiting for about forty-five
minutes and learning that Dr. Davis "hadn't done anything" to treat
her husband, Mrs. Reed asked to have Mr. Reed transferred to Plaza Medical
Center in Fort Worth while there was still time to administer t-PA. Although Mr.
Reed was eventually transferred by ambulance to Plaza Medical Center, he arrived
there outside the three-hour window for receiving t-PA.(2)
The Reeds contend that, because he was not administered t-PA, Mr. Reed is
significantly and permanently disabled from the stroke.
On the date of Mr. Reed's stroke,
the Hospital had t-PA available and also had a written policy allowing its
administration to cardiac patients. The Hospital did not, however, have a
protocol for administering t-PA to stroke victims, and it had no written
standard of care for stroke patients. Dr. Davis testified that, although he did
not rely on the Hospital to advise him regarding what medical treatments were
appropriate for a patient, including Mr. Reed, he did not consider administering
t-PA to Mr. Reed without a Hospital protocol.
Dr. Davis believed that the
Hospital lacked the medical staff (a neurologist or neurosurgeon) and equipment
necessary to safely administer t-PA to stroke patients. He testified that a
neurological group from Fort Worth had made a presentation to the Hospital's
emergency room staff and offered to make arrangements to administer t-PA in Fort
Worth to the Hospital's stroke patients should the need arise. Dr. Davis had
consulted with the neurological group on several occasions, but the patients
involved had never met the criteria, "time-wise or other
contraindications," to be transferred to a Fort Worth hospital for t-PA
administration. The record does not indicate whether Dr. Davis consulted with
the neurological group concerning Mr. Reed.
III. Procedural
History
The Reeds sued the Hospital for
negligence in the medical treatment Mr. Reed received; however, Dr. Davis was
not made a defendant. In their petition, the Reeds alleged that the Hospital was
negligent in the following respects:

  failing to have adequate
 medical care policies with respect to the treatment and/or referral of
 patients with symptoms or conditions like Mr. Reed's;
  failing to disclose that t-PA
 was not available to treat stroke victims such as Mr. Reed;
  restricting Dr. Davis from
 administering t-PA for stroke;
  maintaining a defective
 protocol for the administration of t-PA for stroke;
  failing to have an effective
 medical quality assurance process that would have prevented the outcome in Mr.
 Reed's case.(3)

The Hospital moved for summary
judgment on the Reeds' claims on the following grounds:

  the Reeds had presented no
 reliable scientific evidence regarding the alleged violations of the standard
 of care applicable to this case;
  the Reeds had presented no
 reliable scientific evidence of causation;
  as a matter of law, the Reeds
 could not recover on their theory that the Hospital prevented Dr. Davis from
 administering t-PA because hospitals are legally barred from practicing
 medicine.

The Hospital also moved to strike
the affidavits and deposition testimony of Drs. Paul K. Bronston and Bruce
Adornato, the Reeds' two designated expert witnesses, on grounds that Drs.
Bronston and Adornato were not qualified to render expert opinions on the
standard of care or causation issues and that their opinions were not reliable
under Texas Rule of Evidence 702, E.I. du Pont de Nemours & Co. v.
Robinson, 923 S.W.2d 549 (Tex. 1995), and Daubert v. Merrell Dow Pharms.,
Inc., 509 U.S. 579, 113 S. Ct. 2786 (1993).
After a hearing, the trial court
ruled that the Hospital had a duty to use reasonable care in formulating the
policies and procedures that governed its medical staff and nonphysician
personnel and to "establish reasonable policies, procedures and protocols
regarding standard of care." However, the trial court granted the
Hospital's motion to strike Drs. Bronston's and Adornato's testimony on the
standard of care and ruled that they could not testify on any of the standard of
care issues in the case. The trial court also sustained the Hospital's
objections to the testimony of Michael Lavender, R.N., a Hospital employee,
regarding whether the Hospital's lack of guidelines prevented the use of t-PA on
Mr. Reed.
The trial court granted the
Hospital a no-evidence summary judgment on the Reeds' negligence claims because
there was no evidence on the applicable standard of care. The trial court also
granted the Hospital summary judgment that the Reeds could not recover based on
their theory that the Hospital was liable to them because it had prevented or
did not allow the administration of t-PA to stroke patients. The trial court
denied the Hospital's motion to strike Drs. Bronston's and Adornato's affidavits
based on Daubert/Robinson, the Hospital's motion to strike the doctors'
testimony on causation, and the Hospital's motion for summary judgment on
causation.(4)
IV. Standard of
Care
In their first and second issues,
the Reeds assert that the trial court abused its discretion by striking their
experts' testimony on the standard of care because the experts were qualified to
render opinions on this issue and their testimony was reliable. The Reeds
further contend that the trial court erred in granting the Hospital summary
judgment because there is more than a scintilla of evidence on the standard of
care.
A. Establishing the
Standard
A hospital may be liable for
injuries arising from the negligent performance of a duty that the hospital owes
directly to a patient. Denton Reg'l Med. Ctr. v. LaCroix, 947 S.W.2d
941, 950 (Tex. App.--Fort Worth 1997, pet. denied). One such duty is the duty to
use reasonable care in formulating the policies and procedures that govern the
hospital's medical staff and nonphysician personnel. Id. Before a fact
finder can consider whether a hospital's deviation from the standard of care is
negligent, however, the plaintiff must first establish what the standard of care
is. Id.; Johnson v. Berg, 848 S.W.2d 345, 348 (Tex.
App.--Amarillo 1993, no writ); Coan v. Winters, 646 S.W.2d 655, 657
(Tex. App.--Fort Worth 1983, writ ref'd n.r.e.); Richard L. Griffith & Dewey
W. Johnston, Texas Hospital Law: Liability & Damages § 3.1.1 at 3-3 (3rd
ed. 2003).
The test used to determine the
standard of care a hospital is required to use in formulating its policies and
procedures is what a hospital of ordinary prudence would have done under the
same or similar circumstances. LaCroix, 947 S.W.2d at 950; Texas
Hospital Law: Liability & Damages § 3.1.1 at 3-3. Circumstances to be
considered include, but are not limited to, the expertise of and means available
to the hospital and the state of medical knowledge. Hood v. Phillips,
554 S.W.2d 160, 165 (Tex. 1977). Expert testimony is generally required to
establish the governing standard of care and to determine whether the standard
has been breached. Id. at 165-66; LaCroix, 947 S.W.2d at 950.
While the standard of administrative care at a hospital may be established by
lay testimony, medical expert testimony is required where, as here, the
underlying issue involves the performance of medical procedures. LaCroix,
947 S.W.2d at 950-51; Texas Hospital Law: Liability & Damages § 3.1.2 at
3-5.
There are certain standards
universally regarded as ordinary medical standards beneath which no common or
community standards may fall. Webb v. Jorns, 488 S.W.2d 407, 411 (Tex.
1972). This is because universality of education, training, testing, and travel
in the realm of medical treatment have produced a correspondent right to expect
the same basic quality of care from region to region. Hall v. Huff, 957
S.W.2d 90, 101 (Tex. App.--Texarkana 1997, pet. denied). These universal
standards apply to multiple schools of practice and to any medical doctor. Blan
v. Ali, 7 S.W.3d 741, 746 (Tex. App.--Houston [14th Dist.] 1999,
no pet.).
B. Qualifying the
Expert
The rules of evidence provide that
one qualified as an expert by "knowledge, skill, experience, training, or
education" may testify in a case where specialized knowledge will assist
the fact finder. Tex. R. Evid. 702. A two-part test governs whether expert
testimony is admissible: (1) the expert must be qualified; and (2) the testimony
must be relevant and be based on a reliable foundation. Exxon Pipeline Co.
v. Zwahr, 88 S.W.3d 623, 628 (Tex. 2002); Helena Chem. Co. v. Wilkins,
47 S.W.3d 486, 499 (Tex. 2001). Whether an expert is qualified under Rule 702 is
a preliminary question to be decided by the trial court, and the party offering
the expert's testimony bears the burden of proving the witness's qualifications.
Gammill v. Jack Williams Chevrolet, Inc., 972 S.W.2d 713, 718 (Tex.
1998); Broders v. Heise, 924 S.W.2d 148, 151 (Tex. 1996).
In deciding whether an expert is
qualified, the trial court "must ensure that those who purport to be
experts truly have expertise concerning the actual subject about which they are
offering an opinion." Helena Chem. Co., 47 S.W.3d at 499 (quoting Broders,
924 S.W.2d at 152). General experience in a specialized field is insufficient to
qualify a witness as an expert. Pack v. Crossroads, Inc., 53 S.W.3d
492, 506 (Tex. App.--Fort Worth 2001, pet. denied). "What is required is
that the offering party establish that the expert has 'knowledge, skill,
experience, training, or education' regarding the specific issue before the
court which would qualify the expert to give an opinion on that particular
subject." Broders, 924 S.W.2d at 153.
The trial court has broad
discretion to determine admissibility, and we will not reverse the trial court's
ruling absent a clear abuse of that discretion. Exxon Pipeline Co., 88
S.W.3d at 629; Helena Chem. Co., 47 S.W.3d at 499; Broders,
924 S.W.2d at 151. A trial court abuses its discretion only if it acts
arbitrarily and capriciously, without reference to any guiding rules or
principles. See Carpenter v. Cimarron Hydrocarbons Corp., 98 S.W.3d
682, 687 (Tex. 2002); Downer v. Aquamarine Operators, Inc., 701 S.W.2d
238, 241-42 (Tex. 1985), cert. denied, 476 U.S. 1159 (1986). Merely
because a trial court may decide a matter within its discretion in a different
manner than an appellate court would in a similar circumstance does not
demonstrate that an abuse of discretion has occurred. Downer, 701
S.W.2d at 242.
C. Dr. Bronston's
Qualifications
In this case, the specific issue
before the trial court was whether Drs. Bronston and Adornato were qualified to
opine about whether a hospital of ordinary prudence with the Hospital's
capabilities would have had a protocol in place concerning the administration of
t-PA to stroke patients and, if so, whether the doctors' opinions were reliable.
The record shows that Dr. Bronston
was board-certified in emergency medicine, which he had practiced since 1987,
and that he had been on the emergency medical staff at two Los Angeles-area
hospitals since 1995. He was also a contributing author to a textbook on managed
care in emergency medicine entitled Emergency Medicine Risk Management.
He saw at least fifty stroke patients annually and administered t-PA to those
whose conditions qualified them for it. Based on these qualifications, Dr.
Bronston opined that "it was and is the obligation, good practice, and the
standard of care for physicians and hospitals to facilitate the
opportunity" for qualified stroke patients to receive t-PA treatment.
Dr. Bronston's own testimony
established, however, that despite his expertise as an emergency room physician,
his knowledge of hospital policies and procedures concerning the administration
of t-PA to stroke patients was virtually nonexistent. His deposition testimony
demonstrated only that he was familiar with the protocols for the administration
of t-PA to stroke patients in the two hospitals where he practiced. There is no
evidence in either Dr. Bronston's affidavit or his deposition testimony that he
knew what any other hospital's protocols were concerning the administration of
t-PA to stroke patients, whether in California, Texas, or elsewhere in the
United States.
Further, the record shows that Dr.
Bronston merely considered himself qualified to testify concerning the standard
of care applicable to a physician. When asked during his deposition about his
expertise, he stated that he considered himself an expert "[a]s far as
what's needed as the appropriate expertise for an emergency room physician.
. . . [A]s far as what's required for the standard of care for an emergency room
doctor. [Emphasis supplied.] Likewise, in his affidavit, Dr. Bronston
stated:

        
 Based on my education, training, and experience, I am familiar with and
 qualified to offer an opinion regarding the standard of care for treating
 acute stroke patients who presented to an emergency room in March of 1998
 within three hours of the onset of their symptoms, and with no
 counter-indications, as happened in Jess Reed's case. [Emphasis supplied.]

At most, Dr. Bronston's
qualifications and testimony demonstrate that he was qualified to give an expert
opinion concerning the standard of care applicable to a physician's decision of
whether to administer t-PA to a stroke patient. The record does not show that
Dr. Bronston possessed any special knowledge about what protocols, policies, or
procedures a hospital of ordinary prudence, with the Hospital's capabilities,
would have had in place. See Gammill, 972 S.W.2d at 718-19; JCPenney
Life Ins. Co. v. Baker, 33 S.W.3d 417, 426 (Tex. App.--Fort Worth 2000, no
pet.) (both holding that offering party must demonstrate that expert witness
possesses special knowledge on the precise matter about which he is called to
testify). Accordingly, the trial court did not abuse its discretion by
concluding that Dr. Bronston was not qualified by knowledge, skill, training, or
experience to testify about the standard of care applicable to the Hospital in
this case. See Broders, 924 S.W.2d at 153-54.
D. Dr. Adornato's
Qualifications
Dr. Adornato, a neurologist, had
thirty years' experience treating stroke patients. He testified that he was an
expert in t-PA therapy because he knew the literature, understood t-PA and its
inclusions and exclusions, and was competent to administer it. He estimated
seeing one hundred stroke patients per year, one to two percent of whom he
referred for t-PA administration. He also reported providing consultation to
other physicians concerning whether their stroke patients were candidates for
t-PA. Further, he testified that he was familiar with and qualified to offer an
opinion regarding the standard of care for treating acute stroke
patients in March of 1998. Dr. Adornato also had some experience in developing
hospital protocols. Although he had not developed a t-PA protocol, he had
participated in the creation of a hospital protocol in stroke pathways, which,
according to him, was an area similar to t-PA therapy.
Based on his knowledge, training,
and experience, Dr. Adornato opined that, in March of 1998, "every hospital
that ha[d] a functioning CT scanner and an emergency room with 24-hour-a-day
emergency care should have [had] a TPA protocol in place" permitting
physicians to administer t-PA to patients who presented with acute stroke, even
if the facility did not have a neurosurgeon or neurologist on staff. Like Dr.
Bronston, however, Dr. Adornato demonstrated a complete absence of familiarity
with hospital protocols for the administration of t-PA to stroke patients, with
the possible exception of the hospitals in which he practiced.
In March 1998, Dr. Adornato was on
staff at four hospitals: Stanford Medical Center, the Palo Alto Veterans
Administration Hospital, and two hospitals in the San Francisco area. He did not
testify that any of these hospitals had t-PA protocols in place at that time.
Indeed, Dr. Adornato admitted having no knowledge concerning how common hospital
t-PA protocols were for stroke patients. Even by the date of his deposition in
December 2000, Dr. Adornato had not conducted any type of survey to determine
how many hospitals in the State of California had t-PA protocols for stroke. He
was not even certain whether the VA hospital where he practiced had such a
protocol. As was the case with Dr. Bronston, there is no evidence that Dr.
Adornato possessed any special knowledge about what protocols, policies, or
procedures a hospital of ordinary prudence, with a CT scanner and 24-hour
emergency service, would have had in place--whether in California, Texas, or
elsewhere in the United States. See Gammill, 972 S.W.2d at 718-19; JCPenney
Life Ins. Co., 33 S.W.3d at 426. Thus, the trial court did not abuse its
discretion by concluding that Dr. Adornato was not qualified to testify about
the standard of care applicable to the Hospital in this case. See Broders,
924 S.W.2d at 153-54.
The cases on which the Reeds rely
are not on point. In JCPenney Life Insurance Co., the expert internist
demonstrated that he was qualified, based on his knowledge and years of
experience, to opine about whether the decedent had died from coronary artery
disease. 33 S.W.3d at 426-27. The expert neurologist in Blan
demonstrated both that he was qualified to opine regarding the standard of care
applicable to the treatment of stroke patients and that a common standard
applied regardless of whether the treating physician was a neurologist, a
cardiologist, or an emergency room physician. 7 S.W.3d at 746-47; see also
Keo v. Vu, 76 S.W.3d 725, 732 (Tex. App.--Houston [1st Dist.]
2002, pet. denied) (holding that, if subject matter is common to and equally
recognized in all fields of practice, any physician familiar with the subject
may testify regarding the standard of care).
Here, neither Dr. Bronston nor Dr.
Adornato demonstrated having knowledge or experience that would have qualified
them to opine concerning whether a hospital of ordinary prudence with the
Hospital's capabilities would have had a t-PA protocol for stroke in March 1998.
In addition, there has been no showing that a common or universal standard of
care for administering t-PA to stroke patients applied to both physicians and
hospitals, or even to all hospitals.(5)
The Reeds contend that Drs.
Bronston and Adornato demonstrated their familiarity with the standard of care
under the "same or similar circumstances" as those at the Hospital
because they opined that any hospital equipped with a CT scanner, as the
Hospital was, should have had a t-PA protocol in place for stroke patients. See
Hall, 957 S.W.2d at 100-01 (holding that expert was qualified to testify
regarding standard of care where he professed familiarity with standard
"under same or similar circumstances" and record contained no evidence
of nonuniversal standard of care). We disagree. Drs. Bronston's and Adornato's
testimony demonstrated that they were not familiar with what a hospital
of ordinary prudence so equipped would have done; instead they had simply formed
opinions, despite their limited knowledge of hospital protocols, policies,
procedures, about what they thought the standard of care should be.(6)
For all of the foregoing reasons,
we conclude that the trial court did not abuse its discretion by striking Drs.
Bronston's and Adornato's testimony on the standard of care. We overrule the
Reeds' first issue.
E. Other Evidence
The Reeds contend that, even
without their experts' testimony on the standard of care, there is some evidence
of the standard of care hospitals are required to use in formulating protocols,
policies, or procedures for treating stroke patients. The Reeds assert that the
Hospital's policy and procedure on the scope of services to be provided by its
emergency department, its performance improvement plan, and its representations
to the community are some evidence that the standard of care was to have at
least a written protocol in place for treating stroke patients. The Reeds also
contend that the testimony of the Hospital's resource management director was
more than a scintilla of evidence of the standard of care.
While a hospital's internal
policies and procedures do not, alone, determine the standard of care, they may
be considered in determining that standard. LaCroix, 947 S.W.2d at 951;
accord Fenley v. Hospice in the Pines, 4 S.W.3d 476, 481 (Tex.
App.--Beaumont 1999, pet. denied); McCombs v. Children's Med. Ctr., 1
S.W.3d 256, 259 (Tex. App.--Texarkana 1999, pet. denied). The policies at issue
here, however, are not evidence of the standard of care asserted by the Reeds.
The emergency department policy and
procedure simply stated that the Hospital would provide emergency services for
"major emergencies," including stroke. The Hospital's performance
improvement plan directed the Hospital to monitor the appropriateness of patient
care relevant to a patient's needs, "given the current state of
knowledge." In an advertisement, the Hospital stated that it had become a
member of Community Health Systems because membership in this healthcare company
would provide the Hospital support "to build a stronger hospital" that
could compete against larger regional facilities. The advertisement also stated
the Hospital's "vigorous commitment to the best in medical equipment,
services and support."
Nothing in these broad policies and
statements evidences a standard of care requiring a written protocol for the
treatment of stroke victims. In addition, without medical expert testimony,
there is no evidence of what the "current state of medical knowledge"
was in March 1998.
The Reeds' reliance on our opinion
in LaCroix is misplaced. In that case, the hospital had in place a
specific policy that required an anesthesiologist to supervise the
administration of anesthesia by a certified registered nurse anesthetist (CRNA).
947 S.W.2d at 951. An anesthesiologist testified that this policy met the
standard of care for the administration of anesthesia, but the evidence showed
that the hospital had violated its policy by not requiring an anesthesiologist
to supervise the CRNA's administration of anesthesia to the plaintiff. Id.
at 954. Here, the Hospital had no policy requiring it to adopt a written
protocol for the treatment of stroke patients, nor was there any medical expert
testimony stating that having such a protocol was the standard of care. There is
no evidence that the Hospital's resource management director was a physician;
therefore, her testimony is not evidence of the standard of care. See id. at
950-51 (stating the medical expert testimony is required to establish standard
of care for matters involving the performance of medical procedures).
The Reeds also contend, without
giving any specifics, that Dr. Davis's testimony is some evidence of the
standard of care. We find nothing in Dr. Davis's affidavit or deposition
testimony about the standard of care applicable to hospitals, and the Reeds do
not direct us to any such evidence.
In summary, there is no evidence in
the record concerning what standard of care applied to the Hospital in the
formulation of its protocols, policies, or procedures for the treatment of
stroke patients. Therefore, the trial court did not abuse its discretion by
granting summary judgment for the Hospital on the Reeds' negligence claims on
the basis that there was no evidence of the standard of care. See Tex.
R. Civ. P. 166a(i); S.W. Elec. Power Co. v. Grant, 73 S.W.3d 211, 215
(Tex. 2002) (both providing that no-evidence summary judgment is proper when
there is no evidence to support an essential element of the nonmovant's claim).
We overrule the Reeds' second issue.(7)
F. Nurse Lavender's
Testimony
In their third issue, the Reeds
complain that the trial court improperly struck the testimony of a Michael
Lavender, a Hospital nurse, that the Hospital's lack of a t-PA protocol for
stroke prevented the use of t-PA for stroke patients. The Reeds contend that the
Hospital was negligent because its lack of a t-PA protocol for stroke
constituted a "de facto" policy that prevented the administration of
t-PA to stroke patients. The Reeds state, however, that Lavender's testimony was
not offered to show the standard of care. Because there is no other evidence of
what standard of care should be applied to the Hospital in the formulation of
its policies, Lavender's testimony, even if competent, would not have precluded
summary judgment for the Hospital on the Reeds' negligence claims.
In Texas, medical decisions are to
be made by attending physicians. See Boney v. Mother Frances Hosp., 880
S.W.2d 140, 144 (Tex. App.--Tyler 1994, writ denied). A hospital cannot practice
medicine and therefore cannot be held directly liable for any acts or omissions
that constitute medical functions. Spinks v. Brown, 103 S.W.3d 452, 456
n.4 (Tex. App.--San Antonio 2002, pet. filed); see also Tex. Occ. Code
Ann. § 151.002(a)(13) (Vernon 2003) (defining "practicing medicine"
as the diagnosis, treatment, or offer to treat a physical disease, disorder, or
injury by a licensed physician or surgeon); id. §§ 155.001, .003
(prohibiting a person from practicing medicine without a license and providing
no means by which a hospital can become licensed).
The Hospital's medical expert
testified by affidavit that the decision whether to administer t-PA to a stroke
patient is a medical decision made only by a physician. Dr. Bronston testified
similarly.(8) Because the summary judgment
evidence shows that the decision whether to administer t-PA to Mr. Reed was one
that only a physician could have made, the trial court did not abuse its
discretion in striking Lavender's testimony, and summary judgment for the
Hospital on the Reeds' prevention by de facto policy theory was proper. See
Elliott-Williams Co. v. Diaz, 9 S.W.3d 801, 803 (Tex. 1999) (holding that
defendant is entitled to traditional summary judgment where evidence
establishes, as a matter of law, that at least one element of plaintiff's cause
of action cannot be established). We overrule the Reeds' third issue.
V. Conclusion
Having overruled all of the Reeds'
issues on appeal, we affirm the trial court's judgment.
 
                                                                       
JOHN CAYCE
                                                                       
CHIEF JUSTICE
 
PANEL A: CAYCE, C.J.; DAY and
LIVINGSTON, JJ.
LIVINGSTON, J. filed a dissenting
opinion.
DELIVERED: August 29, 2003

COURT
OF APPEALS
SECOND
DISTRICT OF TEXAS
FORT WORTH
NO. 2-01-329-CV
 
JESS WILLIAM REED, MAUREEN REED,       
           
           
           
    APPELLANTS
LYNN BAUGH, DONNA REED, AND
JENNIFER REED
V.
GRANBURY HOSPITAL CORPORATION       
           
           
           
        APPELLEE
D/B/A LAKE GRANBURY MEDICAL CENTER
 
------------
FROM THE 355
TH DISTRICT COURT OF HOOD
COUNTY
------------
DISSENTING OPINION
------------
I respectfully dissent from
the majority's opinion that there was either no evidence to establish whether
the Hospital should have had a t-PA protocol in 1998 and whether the lack of
such a protocol might have prevented its use for Mr. Reed, or insufficient
evidence to at least create a fact issue, rendering summary judgment
inappropriate. I disagree with the majority's determination that the trial
court's decision to exclude two of the appellants' experts on the appropriate
standard of care for a hospital regarding t-PA was not an abuse of discretion.
In its opinion the majority acknowledges this own court's opinion in LaCroix
as our guide in determining what duties a hospital may have directly to a
patient. Denton Reg'l Med. Ctr. v. LaCroix, 947 S.W.2d
941, 950 (Tex. App.--Fort Worth 1997, pet. denied). In that opinion, we held
that a hospital has a duty to use reasonable care in formulating the policies
and procedures that govern a hospital's medical staff and nonphysician
personnel. Id. To determine whether a hospital has
deviated from its duty, we must determine whether a hospital deviated from the
standard of care to a degree that constitutes negligence. Id.
"While the standard of administrative care at a hospital may be established
by lay testimony, expert testimony is required when the underlying issue
involves the performance of medical procedures." Id.
at 950-51.
In the LaCroix case, medical expert testimony of
the very type excluded by this trial court was admitted. There, however, it was
the hospital's failure to follow its own policies and procedures as opposed to
failing to even have a policy or procedure, as is the case here. Maj. Op. at 19.
This distinction is of no significance. Testimony was clear that there were only
two requirements for providing t-PA as a potential treatment: a functioning CT
scanner and the medicine itself. This hospital had both. The appellants' two
experts, who were sufficiently qualified to testify as to causation, were, by
definition, then qualified to testify to appropriate hospital policy: if there
is no hospital policy in place to accommodate (or even prevent) a medical doctor
from acting in conformity with the current medical
standard of care, surely the patient has presented enough evidence to show that
the hospital standard of care has not been met.
Interestingly, the majority accuses the appellants of failing to provide hospital
expert testimony regarding the medical standard of care,
and failing to provide medical expert testimony for
opinions on hospital policies. Maj. Op. at 16, 18-19.
Therefore, I would conclude and hold that the appellants' experts should not
have been struck as to standard of care, and the trial court should not have
granted the no-evidence motion for summary judgment and resulting final summary
judgment.
For these reasons, I believe the judgment should be reversed and the
cause remanded for trial.
 
                                                                       
TERRIE LIVINGSTON
                                                                       
JUSTICE
 
DELIVERED: August 29, 2003


Majority
Foot Notes:
1. T-PA stands for tissue plasminogen activator.
2. The Reeds do not direct us to any evidence that Plaza
Medical Center had a protocol for administering t-PA to stroke patients.
3. The Reeds also alleged that the Hospital was
vicariously liable under various agency and respondeat superior theories, but
the trial court granted the Hospital summary judgment on those claims, and the
Reeds do not challenge that ruling on appeal.
4. The trial court did not initially rule on the causation
ground in the Hospital's summary judgment motion. The trial court's final
judgment incorporated the partial summary judgment, however, and ruled that
"[a]ll relief not expressly granted herein is denied."
5. Indeed, the record shows quite the opposite. While
there is evidence that the hospitals at which Drs. Bronston and Adornato
practiced had t-PA protocols in place by the date of the doctors'
depositions, there is no evidence that any other hospitals in California
had such protocols. Further, there is evidence that few hospitals in North Texas
had protocols in place in March 1998 governing the administration of t-PA to
stroke patients. Dr. R. Lynn Rea, one of the Hospital's experts, conducted a
survey which showed that, in March 1998, only two of seventeen hospitals in and
around North Texas had adopted such protocols. Both of these hospitals were in
Dallas. By contrast, hospitals in Waxahachie, Irving, Richardson, Weatherford,
Plano, Stephenville, Kaufman, Decatur, and Paris, Texas had no t-PA protocols
for stroke patients.
6. The dissent states that "medical expert testimony
of the very type excluded by this trial court was admitted" in LaCroix
and that Drs. Bronston and Adornato were "by definition" qualified to
testify concerning the standard of care applicable to a hospital because they
were qualified to testify concerning causation. Dissent at 2-3. The expert
testimony admitted in LaCroix was offered to prove distinct standards
of care applicable to anesthesiologists and to hospitals. Unlike this case, the
standard of care for the hospital in LaCroix was established
by qualified expert testimony specifically showing what a hospital of ordinary
prudence would have done under the same or similar circumstances. See
LaCroix, 947 S.W.2d at 953-54. Neither of the Reeds' experts demonstrated
having any knowledge or experience that would have qualified him to give an
opinion regarding the protocol a hospital of ordinary prudence would have had in
place for stoke victims at the time Mr. Reed was under the Hospital's care. The
mere fact the experts may have been qualified to give testimony on the cause of
Mr. Reed's injury does not, of course, qualify them to testify about the
standard of care applicable to hospitals, as the dissent suggests.
7. In light of our holdings with regard to the Reeds'
first two issues, we need not consider the Reeds' arguments that their experts'
testimony was reliable or that the summary judgment evidence raised a fact issue
concerning whether the Hospital had breached the standard of care. See
Tex. R. App. P. 47.1 (providing that appellate court need only address every
issue necessary to the disposition of the appeal).
8. Dr. Bronston testified that a physician who deemed t-PA
necessary or appropriate for a stroke patient could administer the drug even
without a hospital protocol, because "just not necessarily having a
protocol doesn't mean that you can't practice medicine." The trial court
properly considered this testimony because the court struck only Dr. Bronston's
testimony on the standard of care.

End of Majority Opinion Foot Notes